# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| APRIL SCHUSTER, | CASE NO. 4:23-CV-00361-DAR |
| Plaintiff, | |
| | JUDGE DAVID A. RUIZ |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff April Schuster ("Plaintiff" or "Ms. Schuster") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.        Procedural History

On January 7, 2018, Ms. Schuster filed an application for DIB, alleging a disability onset date of September 30, 2017.  (Tr. 183.)  Her date last insured is September 30, 2021.  (Tr. 15, 183, 1728.)  She alleged disability due to: respiratory system difficulties (asthma); digestive issues (GERD, IBS, Crohn's,[1] dumping syndrome); depression and anxiety; musculoskeletal

---

[1]  Ms. Schuster listed "Chromes" as a type of digestive condition in her Adult Disability Report (Tr. 220), which the undersigned construes as an inadvertent error meant to indicate "Crohn's," an inflammatory bowel disease.

issues (body/back/legs); hypoglycemia (low blood sugar); learning disability; biopsychosocial disorder; fibromyalgia; crushed disc; nerve damage (loss of feeling in legs); vision blind without glasses; falling due to loss of feeling; mass on brain.  (Tr. 220.)

Ms. Schuster's application was denied at the initial level on March 14, 2018 (Tr. 116-124) and upon reconsideration on October 10, 2018 (Tr. 126-132).  Ms. Schuster filed a written request for a hearing on January 3, 2019.  (Tr. 135-149.)  On November 13, 2019, a hearing was held in Akron, Ohio before an Administrative Law Judge ("ALJ").  (Tr. 34-60.)

On December 2, 2019, the ALJ issued a decision finding that Ms. Schuster had not been under a disability within the meaning of the Social Security Act from September 30, 2017, through the date of the decision.  (Tr. 12-33.)  On August 7, 2020, the Appeals Council denied Ms. Schuster's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5.)  Ms. Schuster appealed this decision to the United States District Court.  In a decision dated January 7, 2022, the assigned magistrate judge recommended that this matter be remanded.  (Tr. 1833-58.)  On January 25, 2022, the Court adopted the Report and Recommendation, remanding this matter for a new hearing.  (Tr. 1859-1861.)

A new hearing before an ALJ was held pursuant to the remand Order on July 15, 2022. (Tr. 1778-1801.)  An unfavorable decision was issued on August 3, 2022.  (Tr.1723-1757.)  Ms. Schuster appealed the decision, but the Appeals Council declined review (Tr. 1713) making the August 3, 2022 decision the final decision of the Commissioner.  On February 3, 2023, Ms. Schuster filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 10, 12.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Schuster was born on February 13, 1984, and has been a younger individual under Social Security regulations at all relevant times. (Tr. 26.)  She has more than a high school education.  (*Id*.)  Ms. Schuster's past relevant work experience work was as a pre-school teacher. (Tr. 26.)  Ms. Schuster had not worked since September 30, 2017, the alleged onset date.  (Tr. 14.)  Her last date insured was September 30, 2021.  (Tr. 1751.)

### B.     Medical Evidence

Although the ALJ identified numerous severe physical and mental impairments (Tr. 1729) and provided a thorough analysis of the same (Tr. 1729-49), Ms. Schuster focuses her arguments on specific parts of the ALJ's analysis relating to her subjective symptoms (ECF Doc. 10, pp. 12-13).  The evidence summarized herein is therefore focused on evidence relevant to that subjective symptom analysis, and is primarily limited to the alleged disability period, from the September 30, 2017 alleged onset date through the September 30, 2021 date last insured.

#### 1.     Relevant Treatment History

In September 2017, shortly before her alleged onset date, Ms. Schuster saw Robert Naples, D.O., her primary care physician, for dizziness and balance issues.  (Tr. 856-57.) She underwent a Vestibular Autorotation Test, with results appearing consistent with a peripheral vestibular pathology—*i.e.*, an inner ear issue.  (Tr. 858.)  The report noted that, in Dr. Naples's experience, patients with this condition "usually respond well to vestibular rehabilitation."  (*Id*.) About a year prior, Ms. Schuster had been referred for a carotid ultrasound based on complaints of occasional dizziness with standing.  (*Id*.)  The ultrasound revealed "normal appearing ultrasound examination or carotid vessels.  (*Id*.)

3

In October 2017, Ms. Schuster returned to Dr. Naples, complaining of chest pain and difficulty breathing "even with the asthma [prescription]." (Tr. 863.) Dr. Naples diagnosed moderate, persistent asthma with no other remarkable findings. (*Id*.) Ms. Schuster underwent a pulmonary function test, but the results could not be interpreted (Tr. 864), and it does not appear that Plaintiff pursued additional pulmonary treatment thereafter.

In November 2017, Plaintiff saw Stephanie Kopey, D.O., of Mercy Health – Howland Physical Medicine and Rehabilitation, for increased headaches and a follow-up on leg and back pain. (Tr. 546-48.) On examination, Ms. Schuster had full range of motion, a normal gait, and no focal deficits other than diminished sensation in the left leg and reduced dorsiflexion in the left ankle. (Tr. 548.) She reported pain at 8/10 that persisted all day, did not radiate, and felt like "jabbing with a knife." (Tr. 546.) At that appointment, she also underwent an EMG/nerve conduction study of her lower left extremity, the results of which were essentially normal. (Tr. 537-39.) Dr. Kopey diagnosed acute intractable headache, degenerative disc disease of the lumbar spine, mechanical low back pain, and left foot drop. (Tr. 548.) She ordered a head CT and lumbar MRI, and prescribed compression stockings and Cymbalta. (*Id*.) The head CT was not approved by Ms. Schuster's insurer, so an MRI was ordered. (Tr. 537.) Ms. Schuster had begun treatment with Dr. Kopey in January 2016, complaining of headaches lasting several hours. (Tr. 758-760.) Her initial diagnosis was intractable migraine. (Tr. 760.)

On November 14, 2017, Ms. Schuster attended a diagnostic evaluation with Kendra Beach, LPC, of PsyCare, reporting depression and pain. (Tr. 897-98.) She said she was living with her husband, daughter, and two sons, and had recently adopted foster children. (Tr. 897.) When asked about her limitations in activities of daily living, she reported the following impairments due to her physical condition: minimal self-care; had to take multiple breaks when

cooking, cleaning, or doing chores due to not being able to stand long; limited to 30 minutes of travel due to sitting; limping while walking; difficulty with steps; slow endurance due to pain and breathing issues; shopping only when needed, assisted by her mother when walking was involved; and very limited social activity, mainly staying at home "other than activities involved with her children and school."  (Tr. 899.)  Her special interests included "watch[ing] her children play sports."  (*Id.*)  She noted she was seeking Social Security disability benefits.  (*Id.*)  Her mental status examination findings were within normal limits, except that she demonstrated moderate depression with a congruent affect and was noted to have a significant limp.  (Tr. 900.)  LPC Beach recommended individual psychotherapy two to four times per month.  (Tr. 904.)

Ms. Schuster returned for psychotherapy on December 13, 2017, attending with her son.  (Tr. 905.)  Mental status findings were unremarkable, except for moderate depression and an affect consistent with her mood.  (Tr. 906.)  LPC Beach stressed the importance of Mr. Schuster taking time to focus on herself for self-care "as she is a care giver for her children," and helped brainstorm ideas for short breaks throughout the day when Ms. Schuster could take time for herself.  (*Id.*)  On December 22, 2017, Ms. Schuster reported "recent issues with children and school" as stressors.  (Tr. 908.)  LPC Beach reviewed information with Ms. Schuster regarding IEP and 504 plans for her children, and Ms. Schuster's homework was to "[f]ollow through with researching IEP/504."  (Tr. 909.)  Ms. Schuster remained moderately depressed on examination, and was observed to shift position, ambulate with a limp, and demonstrate pain behaviors; mental status findings were otherwise unremarkable.  (*Id.*)

A lumbar MRI was performed on December 29, 2017, and the results were read by Joshua Apgar, D.O., a radiologist from Mercy Health.  (Tr. 524.)  The lumbar MRI showed a

small central protrusion of L4-5 without neve compression, mild degenerative disc bulge noted at L3-4, with no significant central or neural foraminal compromise.  (*Id.*).

A brain MRI was also performed that day and read by Dr. Agpar.  (Tr. 523.)  It showed a hypervascular mass arising from the left carotid space, thought to be either a paraganglioma, a meningioma, or a schwannoma.  (*Id.*)  Dr. Apgar assessed: 1. Hypervascular mass arising from the left carotid space at the skull base extending intracranially through the hypoglossal canal; and 2. Paranasal sinus disease.  (*Id.*)  With respect to the mass, Dr. Apgar offered differential diagnoses which included schwannoma and paranglioma.  (*Id.*)

At a psychotherapy session on January 5, 2018, Ms. Schuster reported being sent to a different neurologist due to a tumor found on her spinal cord near her brain.  (Tr. 911.)  Her mood was moderately depressed with a consistent affect, but she was adequately groomed, with adequately articulated speech, cooperative behavior, appropriate and good eye contact, and logical and relevant thought processes.  (Tr. 912.)  She was tense, ambulated with a limp, and demonstrated pain behaviors.  (*Id.*)

Ms. Schuster attended a consultation with neurosurgeon Daraspreet Singh Kainth, M.D., at St. Elizabeth's Neurosurgery on January 10, 2018, to discuss a brain mass found on her MRI.  (Tr. 532-35.)  She complained of persistent headaches.  (Tr. 533.)  Her examination findings were unremarkable, except for baseline weakness of 2/5 in the left lower extremity and 1/5 strength in left hip flexion.  (Tr. 535.)  Dr. Kainth assessed a "[l]eft skull base tumor, probable paraganglioma," and referred Ms. Schuster to skull base neurosurgery in Cleveland for further evaluation and treatment of the lesion.  (*Id.*)

On January 19, 2018, Ms. Schuster was seen by Pablo Recinos, M.D., in Cleveland Clinic's Minimally Invasive Cranial Base & Pituitary Surgery Program (Section of Skull Base

6

Surgery).  (Tr. 879.)  Ms. Schuster reported to Dr. Recinos that she had the December MRI

because her headaches had "changed in character," and reported awakening from sleep lately

with a pressure type sensation on the right side of her head, which she treated with ibuprofen or

Tylenol.  (Tr. 880-81.)  She also reported trouble swallowing but having a normal diet,

explaining she "ha[d] always had trouble [swallowing] due to esophageal strictures and ha[d] not

noticed it any worse than usual" but did notice that her tongue was deviated and her voice

hoarser.  (Tr. 881.)  In his letter to the tumor board, Dr. Recinos stated that Ms. Schuster's

reported symptoms relating to her cranial mass included tongue atrophy, hoarse voice, and

decreased gag on that side.  (Tr. 879.)  Dr. Recinos assessed her with a likely schwannoma,

stating that another diagnosis such as paraglioma was possible.  (Tr. 880.)  Radiation was

recommended for the smaller portion of the tumor that was intracranial—the majority of the

tumor was assessed as extracranial— and the tumor board endorsed a diagnosis of schwannoma

over paraganglioma and recommended radiotherapy.  (*Id*.)

On January 29, 2018, Plaintiff saw Sarah Sittenfeld, M.D., a radiation oncology resident

whose finding and treatment plan were endorsed by supervising physician, Samuel Chao, M.D.

(948-49.)  Her diagnosis was: "likely lower cranial nerve schwannoma, symptomatic."  (Tr. 945.)

She reported a history of migraines and headaches since childhood and said a change in character

of these headaches in late 2017 prompted a brain MRI.  (*Id*.)  She complained of "at least some

pain all day, every day, about 5-6/10," which was worse at night and sometimes woke her.  (*Id*.)

She also reported difficulty swallowing and coordinating food, and left tongue weakness, but no

weight loss. (*Id*.)   Dr. Sittenfeld noted that Ms. Schuster had been evaluated by an ear-nose-

throat doctor, Dr. Bryson, "who noted normal vocal fol[d] movement and no secretion pooling

[and] did not recommend any intervention."  (*Id*.)  On examination, Ms. Schuster's speech was

mildly dysarthric, she had decreased sensation on the left V3, a decreased left side palate raise, and tongue deviation to the left with left sided atrophy with mild fasciculations. (Tr. 948.) She had a normal gait with a cane. (*Id.*) Dr. Sittenfeld reviewed treatment options for Ms. Schuster's schwannoma, and recommended radiosurgery over surgery, while cautioning Ms. Schuster that "radiosurgery would unlikely shrink the lesion or improve her symptoms, but more likely stop the growth of the tumor and progression of her symptoms." (*Id.*)

That same day, Ms. Schuster saw neurosurgeon Lilyana Angelov, M.D., regarding next steps for treatment of her tumor. (Tr. 955-60.) After discussing the pros and cons of the treatment options, Ms. Schuster reported that she wished to proceed with radiosurgery. (*Id.*) As to her symptoms, Ms. Schuster reported that she suffered from headaches and "noticed now she has a pressure type sensation on the right side." (Tr. 955.) She also reported trouble swallowing but a normal diet, deviated tongue, hoarseness, and left sided weakness. (*Id.*) Examination findings were unremarkable, including normal gait and observed neurological function, except for the following: slow and slurred speech, lower left side facial numbness, occasional hoarse voice, deviated tongue, and decreased muscle tone in lower left quadrant. (Tr. 958.)

Ms. Schuster underwent stereotactic radiosurgery for the schwannoma on March 2, 2018. (Tr. 948, 1039, 1010-49.) The treatment was administered at Cleveland Clinic by Dr. Angelov, during which Ms. Schuster was attended to by radiation oncology nurse Kellie Carey, RN. (*See* Tr. 1049, 1051, 1060-61.) Dr. Angelov reported that the treatment was delivered without incident or complication. (Tr. 1061.) Nurse Carey's progress notes indicate that Ms. Schuster reported a 10 out of 10 as to pain, which she identified as a headache that caused burning, sharp pain/pressure. (Tr. 1047, 1049.) Nurse Carey also reported that Ms. Schuster was at times hyperventilating, rolling around on cart, crying, dry heaving, and stating that her head pain was

8

increasing.  (Tr. 1047-49.)  Nurse Carey provided comfort measures, including Motrin, Percocet, and hydration.  (Tr. 1049.)  There are similar nurse notes from the procedure by another provider, Cathleen Breeler, RN.  (Tr. 1064.)  Nurse Breeler also endorsed Ms. Schuster's post-treatment nausea and stated that Ms. Schuster was vomiting and complaining of neck and head pain along with nausea.  (Tr. 1058-59.)

After completion of the procedure, Ms. Schuster was seen the same day by Camille Berriochoa, M.D., a radiation oncology resident overseen by Omar Mian, M.D. Ph.D.  (Tr. 1042.)  Dr. Berriocha assessed Ms. Schuster as having developed post-treatment headache and nausea, which was stabilized with Ativan and Percocet.  (*Id*.)  Ms. Schuster was discharged home the same day as the procedure in good condition, with prescriptions for dexamethasone, Percocet, Zofran and Ativan to take as needed.  (*Id*.)  Ms. Schuster was scheduled to see by Dr. Chao's team for a follow-up visit.  (*Id*.)

In June 2018, Ms. Schuster followed up with Dr. Angelov, who had performed the radiosurgery for her schwannoma.  (Tr. 1154.)  She reported that her left-side headache was about the same, and the weakness in her lower left extremity was also consistent.  (*Id*.)  She also reported decreased hearing in her left ear, blurred vision in her left eye, and left deltoid numbness.  (Tr. 1155.)  Physical examination findings were unremarkable except for decreased gag on left side, deviated tongue, with normal gait and intact strength except for 3/5 to 4/5 strength in the left leg.  (Tr. 1156.)

Ms. Schuster was referred for an audiology evaluation, which was held on June 20, 2018.  (Tr. 1450.)  She complained of dizziness, unsteadiness on a regular basis, with more than fifteen falls since December 2017, intermittent tinnitus in left ear, and constant ear pain (5/10).  (*Id*.)  The audiology test was performed by Craig Newman, PhD, CCC-A, in the Otology Audiology

department of Cleveland Clinic.  (*Id.*)  Dr. Newman reported that Ms. Schuster's test results were unremarkable in both ears with "excellent" hearing sensitivity in both.  (Tr. 1450-51.)  He advised Ms. Schuster to consider a vestibular evaluation for her reported falls and dizziness.  (Tr. 1451.)  There is no evidence that she pursued such an evaluation.

In August 2018, Ms. Schuster sought emergency room care for a migraine headache.  (Tr. 1404, 1408-09.)  During this course of care, examination findings showed full range of motion in her back and extremities, intact neurological functioning, and a normal gait.  (Tr. 1230, 1314, 1330, 1406.)  During her August 19, 2018 visit, she was treated by Paul Gould, M.D., at Trumbull Regional Medical Center.  (Tr. 1408.)  Dr. Gould reported that he discussed Ms. Schuster's case with Varun Kshettry, M.D., FAANS, in neurosurgery at Cleveland Clinic.  (*Id.*)  Dr. Gould described Ms. Schuster's reported symptoms and was advised by Dr. Kshretty that schwannomas do not cause headaches.  (*Id.*)  Dr. Kshettry advised that Ms. Schuster did not need to be transferred if her CAT scan was normal, and Dr. Gould reported it was.  (*Id.*)  Dr. Gould explained the foregoing to Ms. Schuster and discharged her that day.  (*Id.*)

Ms. Schuster returned to the same emergency department a few days later, on August 22, for gastrointestinal issues including nausea, diarrhea, and vomiting.  (Tr. 1228-32.)  She stated that she did not want to go to Cleveland Clinic.  (Tr. 1228.)  Physical examination findings were unremarkable, including her throat, eyes, motor function, and gait.  (Tr. 1230.)  Ms. Schuster continued to have intractable vomiting and diarrhea and was admitted for observation at the request of her primary care provider.  (Tr. 1230.)  The clinical impression was gastroenteritis. (Tr. 1232.)  Ms. Schuster remained in the hospital until discharge on August 24.  (Tr. 1233.)

Ms. Schuster had a follow-up appointment with neurosurgeon Dr. Angelov in October 2018.  (Tr. 1471-75.)  She complained of left-side headache treated with oxycodone, difficulty

swallowing, left lower limb weakness, left sided facial numbness, and hoarse voice, all unchanged since her prior visit.  (Tr. 1471.)  She demonstrated some flat affect and complained of increased forgetfulness and thinking difficulty.  (*Id.*)  On examination, she was oriented to person, place, and time, had good recent and remote memory, good attention, concentration, and comprehension, and good fund of knowledge.  (Tr. 1473.)  Her gait was normal, with normal muscle tone in all limbs, normal reflexes, and no decrease in sensation in the upper and lower limbs to touch.  (*Id.*)  Her facial muscles were symmetric and strong, with no decrease in facial sensation, but her gag reflex was decreased, her spontaneous palate movement deviated to the right, and she showed some left sided weakness; motor strength was normal at 5/5, except for 4/5 in left hip flexion and left shoulder abduction and 3/5 left hip extension.  (*Id.*)

Based on this examination, Dr. Angelov found Ms. Schuster was essentially clinically unchanged compared to the prior clinic visit following her March 2018 gamma knife procedure. (Tr. 1475.)  She noted that the "image studies show[ed] the lesion to be stable to slightly smaller in size post gamma knife with central necrosis and no evidence of new lesions."  (*Id.*)  She acknowledged that Ms. Schuster "remains symptomatic (from a[] number of features)," but observed "on careful questioning these are largely unchanged over time and radiographically." (*Id.*)  Dr. Angelov was pleased with how Ms. Schuster was doing and noted that "the intracranial disease currently appears stable to perhaps even somewhat smaller in overall size."  (*Id.*)  She ordered an MRI and return visit in four months.  (*Id.*)

Ms. Schuster returned to neurosurgeon Dr. Angelov in March 2019.  (Tr. 1495-97.)  She complained of increased V3 numbness, left leg numbness/weakness, ongoing swallowing issues, and "persistent left ear hyperacusis when her 7 children are playing loudly."  (Tr. 1495.)  She also complained of occasional right arm numbness, but reported her other symptoms were stable.

(*Id.*)  Ms. Schuster's neurological examination was significant for hypoesthesia on V3, decreased-muffled hearing on the left with hyperacusia, asymmetric palatal elevation (greater on right), left tongue tactile sensation is left, left sided atrophied tongue, left leg proximal and distal weakness of 3/5, left leg hypoesthesia below the knee, and right arm numbness.  (Tr. 1496.)  Dr. Angelov concluded that Ms. Schuster was clinically and radiographically stable, with a stable MRI and symptoms that were relatively stable despite being somewhat symptomatic; she concluded that there was no role for further surgical or radiosurgical interventions.  (Tr. 1497.) She noted that the etiology of Ms. Schuster's left side weakness/numbness was unclear and recommended a repeat lumbar MRI.  (*Id*.)

The repeat lumbar MRI was taken on March 28, 2019, and compared with the prior lumbar MRI of February 12, 2018.  (Tr. 1531-32.)  The imagery was interpreted by Alfonso Rivera, M.D., whose impression was: no significant interval change; no evidence of metastatic disease; small central disc protrusions indenting the thecal sac at L3-4 and L4-5, with mild left foraminal stenosis; and mild bilateral sacroiliitis.  (Tr.1531.)  Dr. Rivera concluded that the MRI was "essentially unchanged when allowing for difference in [imaging] technique."  (Tr. 1532.)

Ms. Schuster returned to neurosurgeon Dr. Angelov in July 2019, complaining of: depression with an associated dysexecutive syndrome consisting of low of attention, impaired working memory, and spatial disorientation; difficulty sleeping; generalized weakness; apathy; and abulia.  (Tr. 1663-67.)  Dr. Angelov found the symptoms "seem[ed] to be reactive to her diagnosis and the fact that she has 7 children and 'need[s] to take care of them.'"  (Tr. 1663.) Ms. Schuster reported that her problems with speech, swallowing, and coughing exacerbated with eating were stable compared with prior visits.  (*Id.*)  In terms of "symptoms related to her intracranial lesion," Dr. Angelov indicated there were "no new issues or concerns and all

symptoms and signs [we]re at her normal baseline." (*Id.*)  On mental status examination, Ms. Schuster was oriented to person, place, and time, with good remote memory and good fund of knowledge; however, she demonstrated "problems with working memory and spatial orientation at questioning" and impaired attention and concentration.  (Tr. 1665.)  On physical examination, Ms. Schuster demonstrated normal gait, coordination, reflexes, and muscle tone, but with generalized symmetrical weakness, decreased sensation in the lower extremities, and impaired positional sensation in the left foot. (*Id.*)  Her neurological examination was normal except for decreased sensation in the left hemifacial region, left atrophy of the tongue, and tongue protrusion deviated to the left.  (*Id.*)  Dr. Angelov found the lesion stable and recommended a follow-up MRI of the brain in six months.  (Tr. 1667.)

In February 2020, Ms. Schuster had a primary care appointment with Dr. Naples during which she requested and received a prescription for a cane because she pulled something in her back when getting up from the couch.  (Tr. 1980.)  She had intact strength on examination, but walked with a limp.  (Tr. 1981).  Dr. Naples offered to refer her for physical therapy, but she declined, stating that she wanted to wait several weeks to decide.  (*Id.*)

Throughout 2020 and 2021—past her September 30, 2021 date last insured—Ms. Schuster engaged with a pain management clinic, Tiffany Pain Group.  She was routinely seen by Anita Koch, Adult Health Clinical Nurse Specialist (ANCC), who was supervised by Joseph Williams, DO.  (*See, e.g.,* 1894 & 1898.)  She visited the clinic monthly, as advised (*see, e.g.*, Tr. 1894), with objective examination findings unchanged from one visit to the next.  Physical examination findings reflected good strength and intact sensation in her upper and lower extremities, except for the lower left extremity, which had decreased distal strength with left foot drop.  (Tr. 1887-1966.)  Findings also included an antalgic gait, difficulty rising from a seated to

a standing position, positive straight leg raising bilaterally, and limited range of motion in the neck and lower back. (*Id*.)

Ms. Schuster was treated with Percocet, which was routinely noted to reduce her pain and improve her functional ability without adverse effects. (*Id*.) Her Percocet dosage remained consistent at 7.25mg three times a day (*see, e.g.,* Tr. 1901-02, 1965) after being increased from an original dosage of 10mg twice a day in April 2020 (*see, e.g.,* Tr. 1897, 1901-02). ANCC Koch reported that Ms. Schuster did not demonstrate symptom magnification or drug seeking behavior (*see, e.g.,* Tr. 1892, 1896) although some types of examinations, like pill counting, were not possible during the beginning of the COVID-19 pandemic (*see* Tr. 1904). Her pill count was generally appropriate, except for October 8, 2020, when a three-pill shortage was noted. (Tr. 1923.) Ms. Schuster explained that she had taken extra medication because of symptoms related to a fall and was advised not to self-medicate in the future. (*Id.*)

While her specific complaints sometimes varied, Ms. Schuster generally reported pain in her neck, head, lower back, and left lower extremity. (*See generally* Tr. 1887-1966). In February 2020, she reported that her pain symptoms were moderate and continued to improve with the use of her medicine sparingly. (Tr. 1891.) In March 2020, she reported that her symptoms continued to be primarily in her low back and left lower extremity, but that she had occasional head pain. (Tr. 1895.) In April 2020, she complained of frequent falls, and said she was awaiting further evaluation and a new MRI; she reported that she was struggling to take care of her seven foster children during the day due to the pain. (Tr. 1899.) In May 2020, she complained of severe low back and left lower extremity pain, but also reported better pain control with her new prescription for Percocet three times daily. (Tr. 1903.) She reported at her May, June, and July 2020 visits that she continued to care for her seven foster children. (Tr.

1903, 1907, 1911.)  She reported in August 2020 that her symptoms were moderate, and that she had been told she would need to provide home schooling for her children starting in five days. (Tr. 1915.)  In September 2020, she reported that low back and bilateral radicular pain continued to interfere with her activities of daily living, but that her primary complaint that day was head pain.  (Tr. 1919.)  She also complained of difficulty speaking and being aphasic for ten hours earlier in the week; she had contacted her neurologist Dr. Angelov about this problem.  (*Id.*)  She also reported struggling with home schooling her children.  (*Id.*)  In October 2020, she continued to identify low back and bilateral radicular pain as her primary pain generators.  (Tr. 1923.)  She reported in November 2020 that she would begin physical therapy.  (Tr. 1927.)

On October 14, 2020, Plaintiff saw neurologist Jehangir Maleki, M.D. at the Cleveland Clinic Neurological Institute for a pain management consultation.  (Tr. 2097-2100.)  She complained of left facial and tongue numbness, facial muscle weakness, left-sided headaches, dysphagia, and episodes of aphasia.  (Tr. 2097.)  She described her headaches as constant and pounding, and waxing and waning in intensity.  (*Id.*)  Physical examination findings noted decreased left lower facial numbness and weakness, restricted range of motion in the cervical spine, tenderness and spasms in the bilateral paraspinal muscles, crepitus with passive range of motion in both shoulders, and mild left EHL weakness and decreased sensation to light touch in her left lower extremity, but without affecting coordination or Romberg.  (Tr. 2099-2100.)  Dr. Maleki noted Mr. Schuster's history of chronic pain disorder including low back pain, fibromyalgia, and migraine headaches and recent Gamma knife radiation of lower cranial nerve schwannoma, and indicated "she has also developed cervicogenic [headaches] and wide spread sensitization contributing to her pain and suffering."  (Tr. 2100.)  Due to the chronic nature,

15

extent, complexity, and failure to respond to treatment, Dr. Maleki found Ms. Schuster to be an appropriate candidate for an intensive Chronic Pain Rehabilitation Program. (*Id.*)

On November 10, 2020, Ms. Schuster had a virtual visit for a psychiatric diagnostic evaluation by Joanne Schneider, DNP, RN, APRN, CNP, at the Cleveland Clinic Foundation Center Comprehensive Pain Recovery. (Tr. 2090-94.) Ms. Schuster complained of sharp low back pain with numbness in both legs and "[c]onstant left parietal pain which fe[lt] like a semi-truck ke[pt] backing into her head." (Tr. 2090.) She reported that she continued to experience back pain, leg numbness, forgetfulness, and slurred speech since the GKS for her schwannoma in March 2018. (*Id.*) Her mental status examination findings were unremarkable, except that her affect was blunted and she displayed a marked somatic preoccupation. (Tr. 2093.) NP Schneider's clinical impressions were: chronic pain syndrome, chronic back pain, migraine headaches, status-post GKS for left lower cranial nerve schwannoma, pain disorder associated with psychological and physical factors, depressive and anxiety disorders (by patient report), and therapeutic opioid use disorder. (Tr. 2093-94.) NP Schneider noted that Ms. Schuster was on chronic opioid therapy and reported advising her that research does not support the long-term use of opioids for chronic pain; she recommended that Ms. Schuster talk with her prescribing provider about reducing or weaning from opioid medications. (Tr. 2094.)

NP Schneider recommended that Ms. Schuster participate in a chronic pain rehabilitation program, which would be held Monday through Thursday for 4-6 weeks, from 8:30am-5pm. (Tr. 2094.) She endorsed the program as serving individuals with chronic pain and complex neurological problems, offering improved quality of life to many participants. (*Id.*) Ms. Schuster indicated she wanted to think about it and get back to NP Schneider, due to childcare issues. (*Id.*) There is no evidence that Ms. Schuster pursued this program.

Case: 4:23-cv-00361-DAR  Doc #: 13  Filed: 01/30/24  17 of 45.  PageID #: 2474

During her 2021 visits to the Tiffany Pain Group, Ms. Schuster continued to complain of pain in the left side of her neck and head, lower back, and left lower extremity, which was constant but varying in severity and worsened with activity.  (*See, e.g.,* Tr. 1931, 1939, 1947, 1955, 1963.)  Her physical examination findings remained the same, including normal reflexes and grossly intact sensation in all extremities, with 4/5 strength in the upper extremities and 5/5 strength in the lower extremities, with the exception of distal muscle strength of 3/5 with noted left foot drop; she moved from seated to standing with significant difficulty, demonstrated an antalgic gait, limited lumbar and cervical range of motion, and positive lumbar facet loading and positive straight leg raising.  (*See, e.g.,* Tr. 1933, 1941, 1949, 1957, 1965.)  She continued to take Percocet and over-the-counter Tylenol and Ibuprofen.  (*See, e.g.,* 1935, 1943, 1955, 1959, 1963.)

Ms. Schuster reported in January 2021 that her physical therapy was delayed due to the COVID-19 pandemic and that she did not plan to initiate therapy in the near future.  (Tr. 1931.) There is no evidence that she pursued physical therapy thereafter.  In early-April 2021, Ms. Schuster reported that her low back pain and left lower extremity radiculopathy was the most problematic, and that she only experienced "severe headache that disable her approximately once per week, which was a decrease in frequency."  (Tr. 1943.)  In late-April 2021, she reported a decrease in pain from her analgesic, but noted a delay in filling her prescription when her son was hospitalized for two weeks.  (Tr. 1947.)  In July 2021, she reported that her low back and left lower extremity symptoms remained stable overall but continued to interfere with her activities of daily living and ambulation.  (Tr. 1951, 1955.)  In September 2021, she reported that her left lower extremity pain symptoms had been "overall stable and tolerable."  (Tr. 1959.)  In October 2021, shortly after he date last insured, Ms. Schuster attended a telehealth visit from home because of the Covid-19 virus, where she was "caring for two of her seven children who

17

[we]re COVID positive." (Tr. 1963.)  She reported that her low back and leg pain remained problematic but were improved with medication and that "everything is the same." (*Id.*)

Ms. Schuster continued regular treatment with Tiffany Pain Group after her date last insured, with her clinical findings and medicine regimen remaining unchanged. (*See, e.g.,* Tr. 1963, 1965, 1971, 1973, 2235, 2237, 2243, 2245.)  In April 2022, she reported that "her medication continue[d] to provide adequate decrease in her pain symptoms allowing her to maintain ADLs and care for her 7 children." (Tr. 2239.)

## 2.  Opinion Evidence

### i.  Consultative Examinations

#### a.  2016 Psychiatric Examination

On June 16, 2016, Jennifer Haaga, Psy.D., conducted a psychological consultative examination of Plaintiff at the request of the state agency. (Tr. 447-54.)  Ms. Schuster reported that she was seeking disability due to medical problems and anxiety. (Tr. 447.)  She reported living with her husband of nine years and her three children. (Tr. 448.)  She said she did not hang out with friends but did help with her son's football team by "sit[ting] in the building and direct[ing] them where to go" every two weeks or so. (*Id.*)  She had a high school diploma and an associate's degree, but reported enrollment in special education classes. (*Id.*)  She reported a history of interpersonal problems with supervisors, coworkers, and customers. (Tr. 450.)

Ms. Schuster reported getting only a few hours of sleep a night because of pain. (*Id.*)  As for her activities of daily living, she would get her children ready for school and then spend the day with her youngest son; her youngest son had appointments she would take him to. (*Id.*)  She also reported preparing food while seated and doing laundry with difficulty. (*Id.*)  She was able to drive and had a bank account, but did not manage her own finances. (*Id.*)

18

On examination, she was dressed appropriately but disheveled, and was cooperative with adequate motivation; she demonstrated fleeting eye contact. (*Id.*)  She appeared tired and had difficulty walking and standing after the appointment. (*Id.*)  Her speech and thought processes were normal, except that her speech was slowed and her rhythm was monotonous. (*Id.*)  Her mood was somewhat down with a blunted affect and slowed psychomotor activity. (*Id.*)  She complained of anxiety but demonstrated no motor manifestations of anxiety on examination. (Tr. 451.)  Her cognitive function was estimated to be in the low average range of ability. (*Id.*)  Her attention and concentration were adequate. (Tr. 452.)  Although she reported some difficulties with memory, she demonstrated no significant difficulties on examination. (*Id.*)  She also demonstrated adequate insight and judgment. (*Id.*)

Dr. Haaga diagnosed: adjustment disorder with mixed anxiety and depressed mood; and other specified neurodevelopmental disorder, some problems with learning. (*Id.*)  As to understanding and remembering, Dr. Haaga opined that Ms. Schuster could complete simple routine tasks but might experience difficulties when tasks became more complex. (Tr. 453.)  As to attention and concentration, Dr. Haaga opined that Ms. Schuster would have difficulty with attention or concentration when demands became too great. (*Id.*)  As to interacting with others, Dr. Haaga noted that Ms. Schuster's interaction on examination was adequate but that she reported interpersonal problems in the past. (Tr. 454.)  As to adapting to pressures in a work setting, Dr. Haaga opined that Ms. Schuster would likely have increased symptoms when responding to pressure. (*Id.*)

### b.    2018 Psychiatric Examination

On August 20, 2018, Joseph Konieczny, Ph.D., examined Ms. Schuster at the request of the state agency. (Tr. 1191-96.)  As to her disability status, Ms. Schuster reported that she found

19

out in December that she had a brain tumor.  (Tr. 1191.)  More specifically, she reported being diagnosed "with a possibly cancerous brain tumor in December 2017" and having "Radiation surgery."  (Tr. 1192.)  Since that diagnosis, she reported significant memory deficits, frequent dizziness, numbness on her left side, and light sensitivity.  (*Id.*)  Ms. Shuster reported living with her husband and nine-year-old daughter; she and her husband had also adopted five other children ranging in age between four months and nine years old.  (Tr. 1191.)

As to her activities of daily living, Ms. Schuster reported: she dressed only if leaving the house; she would spend her morning "[p]uking," then "[t]ry to do some chores"; she attended to her children in the afternoon, but would otherwise lay on the couch; she also interacted with her children before bed; she was minimally involved in social activities with friends and occasionally accessed social media.  (Tr. 1193.)  She reported that her husband managed the finances, that she drove "only when [she had] to," and that she did chores minimally and to the extent she was physically capable.  (*Id.*)

On examination, Ms. Schuster had appropriate grooming and hygiene and was cooperative, but was very subdued and her movements and walking were slow and deliberate.  (Tr. 1192.)  She spoke reasonably well, with no looseness of associations or tangentiality, but spoke in a soft tone of voice and gave very brief responses; nevertheless, "she seemed quite capable of expressing herself in a clear and coherent manner."  (*Id.*)  She kept her eyes closed through the majority of the interview, reporting it was due to her light sensitivity.  (Tr. 1193.)  She was oriented to person, place, and time, but her ability to concentrate showed indications of impairment; she showed no deficits in logical abstract reasoning.  (*Id.*)  Her insight was fair, but she showed some deficits in "her awareness of rules of social judgment and conformity" as well as in her overall level of judgment.  (*Id.*)  Dr. Konieczny opined that she appeared to require

20

some degree of supervision and monitoring in managing her daily activities and financial affairs, and that her overall level of functioning was at a reduced level of efficiency.  (*Id.*)

Dr. Konieczny administered the Weschler Adult Intelligence Scale – V, which reflected that Ms. Schuster's full-scale IQ was 55, with verbal comprehension of 66 and processing speed of 62, placing Ms. Schuster's IQ within the extremely low range of adult intellectual functioning. (Tr. 1193-94.)  Dr. Konieczny also administered the Wechsler Memory Scale IV, for which Ms. Schuster's scores lay in the extremely low range; these scores were significantly lower than anticipated given her overall level of intellectual functioning.  (Tr. 1194.)  Dr. Konieczny opined, given Ms. Schuster's education and vocational history, that it appeared she suffered a very significant and global intellectual decline, which was likely a residual effect of the schwannoma and radiosurgery.  (Tr. 1194.)  Dr. Konieczny diagnosed Ms. Schuster with: major neurocognitive disorder due to a history of brain tumor; and major depressive disorder - single episode severe with anxious distress.  (Tr. 1195.)

As to understanding and remembering, Dr. Konieczny opined that Ms. Schuster would have limitations resulting from her neurocognitive disorder.  (*Id.*)  As to attention and concentration, Dr. Konieczny opined that Ms. Schuster would have difficulty maintaining focus and persistence on mild to moderately complex multi-step tasks.  (*Id.*)  As to interacting with others and responding to pressure, Dr. Konieczny opined that Ms. Schuster would have diminished tolerance and diminished coping skills which affected her ability to respond to even simple supervision, interpersonal situations, or pressure situations.  (*Id.*)

### ii.    State Agency Reviewers

A state agency physician, Gerald Klyop, M.D., reviewed the available record in March 2018 and concluded that Ms. Schuster could lift 20 pounds occasionally and 10 pounds

frequently, could stand and/or walk for four hours and sit for six hours in an eight-hour workday, and had additional non-exertional limitations.  (Tr. 82-84.)  In July 2018, a second state agency physician, Indira Jasti, M.D., reviewed the record and concurred with the Dr. Klyop's physical Residual Functional Capacity ("RFC") assessment.  (Tr. 104-06.)

State agency psychological consultant Juliette Savitscus, Ph.D., reviewed the record in February 2018 and found Ms. Schuster retained the ability to: understand and remember 1-3 step tasks; carry out routine work functions, but with no high pace or production requirements; interact with coworkers, supervisors, and the general public on a superficial basis; and complete tasks in a static environment in which changes are infrequent and well explained.  (Tr. 84-86.)

In October 2018, state agency psychological consultant Lisa Foulk, Psy.D., reviewed the record and concurred with Dr. Savitscus's mental RFC assessment.  (Tr. 106-09.)  While Dr. Foulk considered Dr. Konieczny's findings at the August 2018 psychological consultative examination, she found Ms. Schuster's performance on testing at that examination was questionable because she kept her eyes closed during much of the assessment, and that her presentation at the evaluation was not consistent with her daily functioning as reflected in other medical treatment records.  (Tr. 108.)  She noted that Ms. Schuster was helping to care for six children, aged four months to nine years, and participated in some household chores.  (*Id.*)

### 3.  Reports of Daily Activities

On February 21, 2018, Ms. Schuster was contacted by a SSA representative Nealisha Robinson to collect information to develop her disability record.  (Tr. 253.)  Ms. Robinson's notes indicate that Ms. Schuster reported: she had trouble walking more than 50 feet even with her cane; her kids helped with laundry and her mom, aunts, friends and husband (to the extent he was able) all helped with the kids; she could sweep a small amount, lift a gallon of milk with her

cane, and cooked sitting down.  (*Id*.)  Ms. Schuster reported feeling down, keeping to herself and staying in bed most of the day.  (*Id*.)  When her kids were with her, she said they watched TV.  (*Id*.)  Ms. Schuster sometimes went to her kids' school for meetings, sports games, or plays.  (*Id.*)  She took her four-year-old to school every day, and her two-year-old stayed home.  (*Id*.)  Ms. Robinson noted that Ms. Schuster's ability to respond varied throughout the call; she sometimes slurred or stuttered, and other times responded clearly.  (*Id*.)

On September 27, 2018, Ms. Schuster met with LPC Beach, who filled out a Daily Activities Questionnaire as requested by SSA.  (Tr. 263.)  LPC Beach completed the questionnaire on behalf of Ms. Schuster, writing that Ms. Schuster reported high need for rest, low stress tolerance, cognitive and pain issues.  (*Id*.)  She could do "light" food preparation, household chores, and shopping, and was independent in banking and bill paying.  (*Id.*)  She could also drive short distances, and her hygiene was within normal limits.  (*Id*.)  However, she also reported that she relied on her husband for shopping and other activities. (*Id*.)

## C.  Hearing Testimony

### 1.  Plaintiff's Testimony

#### i.  2020 Hearing Testimony

At her November 2019 hearing (Tr. 35-60), Ms. Schuster reported living with her husband and seven children, aged eleven to one year old (Tr. 42).  She reported that her husband received disability benefits, but she could not remember what his disability was; she believed he had mental problems and issues with his back.  (Tr. 42-43.)  She testified that she could not work because of her memory, which had "gone down bad" since her radiation.  (Tr. 46.)  She reported that her mom, kids, and husband helped her with her memory, and that she set timers on her phone.  (*Id.*)  Specifically , she set timers in her phone every day to make sure that she got her

kids off the bus at the appropriate time.  (*Id.*)  She also complained of pain in the left side of her head, her lower back, her female areas, and her left leg.  (Tr. 47.)  The ALJ observed that there were no problems with Ms. Schuster's speech at the hearing "other than the volume maybe," and asked if her speech was okay.  (*Id.*)  She answered that "[i]t comes and goes," and said she sometimes slurred her words and other times could not talk for hours.  (*Id.*)  Ms. Schuster also testified that her left leg was numb "most of the time," and that her family doctor told her to use a cane for stability when her right leg started going numb as well.  (Tr. 52.)  She complained of not wanting to leave the house due to depression.  (Tr. 54.)

Asked about a headache on a "bad, bad day," Ms. Schuster described being in bed, vomiting, barely being able to move, not eating, feeling dizzy, not being able to think, and not being able to get her words out.  (Tr. 48-49.)  She reported having those types of headaches one time per week.  (Tr. 49.)  She also reported normal headaches three to four times per week.  (Tr. 49-50.)  On the days when she felt a bad headache coming, she reported that she would lay down and call her mom to come over.  (Tr. 50.)  She was taking migraine medication and "Tylenol pretty much every other day" for her headaches.  (*Id.*)  On bad days, she would take her pain medicine as well, which she called "Oxy something."  (Tr. 51.)

Asked about her back pain, Ms. Schuster testified that she had trouble bending, could not lift anything heavy, and could only get up on the right if she was on the ground.  (Tr. 52-53.)  When asked why she stopped getting treatment for her back pain, she described being unable to walk for six months after receiving "a nerve block or something."  (Tr. 53.)  She explained that she took Tylenol, used a heating pad, and tried to lay with her head up a little bit to relieve her back pain.  (*Id.*)  She also reported taking Nyquil almost every night due to pain.  (Tr. 54.)

24

Of her seven children, Ms. Schuster reported that five were in school during the day. (*Id.*)  As for the younger two children, Ms. Schuster reported that she sometimes called her mother to help her, "when I need her to."  (*Id.*)  On bad days, she reported that her mother would pick the younger children up and take them to her house; her mother lived one mile down the road.  (*Id.*)  Her husband also helped with discipline, sitting on the couch and telling the kids what to do or putting them in timeout.  (*Id.*)

Describing the household activities she could perform, Ms. Schuster said she could do some sweeping but could not bend down with the dustpan.  (Tr. 50.)  She could sit on the couch and fold laundry, but could not carry the laundry to put it away.  (*Id.*)  She had a drivers license and did drive, but no more than a few minutes from her home because she would get lost.  (Tr. 43.)  She drove to the store a few days before the hearing, less than a one-minute drive.  (*Id.*)  However, she also testified that her mother was doing the shopping for her.  (Tr. 55.)  She used a shower chair because she would dizzy in the shower.  (*Id.*)

### ii.    2022 Hearing Testimony

At her July 2022 telephonic hearing (Tr. 1778-1801), Ms. Schuster reported living with her husband and seven children, aged thirteen to four years (Tr. 1791-92).  She testified that she could not work because she got really bad migraines, dizzy spells, memory and speech issues from a brain tumor, back pain, numbness in her legs that caused falls, stomach issues, and trouble swallowing due to "the left side of her tongue [being] dead."  (Tr. 1789.)  She was depressed and had issues coping with loud sounds.  (*Id.*)  She could walk 50 feet with a cane, which she used four or five days a week.  (*Id.*)  Ms. Schuster rated her pain at an 8 on a 1-10 scale, and said her symptoms were getting worse.  (Tr. 1790.)

25

Ms. Schuster testified that she had migraine headaches at least five to six times per month.  (Tr. 1793.)  During those headaches, she would throw up and had to put a mask on her eyes and "ear things" in her ears.  (*Id.*)  For her back pain, she used medication, heating pads, ice packs, and different exercises.  (Tr. 1794.)  Pain affected her ability to sleep.  (*Id.*)  Asked by the ALJ whether there was a position she could take that was best in terms of back pain, Ms. Schuster responded that sitting sometimes worked, and that she would lay on her stomach or her side at other times; she said standing for longer than a few minutes caused her heart to race.  (*Id.*)

On a typical day, Ms. Schuster testified that it took her a while to sit up in bed and walk because her legs felt like "spaghetti."  (Tr. 1791.)  She would tell her kids that it was time to go to school, and they would get up, get dressed, and eat.  (*Id.*)  She said that she, her husband, and her mom would get the kids squared away for school, saying "on my good days, some of the days I can do it."  (*Id.*)  Normally, Ms. Schuster said she "just [sat] in her chair."  (*Id.*)  She tried to fold laundry when the kids were in school.  (*Id.*)  During the summer, the children were home and played around the house.  (*Id.*)

Ms. Schuster said her husband helped when he could, but her mom helped a lot; she also had friends who came over to help, and her 13- and 12-year-old daughters helped.  (Tr. 1792, 1795.)  Her mom helped with dressing the kids, taking them to the store and practice, and with cleaning and cooking; she came over five days a week, if not more.  (*Id.*)

Ms. Schuster's last job was as a part-time clerk for the Tribune (Tr. 1783), which she was asked to leave because of memory issues (Tr. 1784).  Before that, she was employed in food services, and as a dietary aid, substitute teacher, and preschool teacher.  (Tr. 1784-87.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified. (Tr. 1750, 1795.)  The VE testified that a hypothetical individual of Ms. Schuster's age, education, and work experience, and the functional limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including tube operator, parimutuel ticket checker, and addresser.  (Tr. 1798.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV.      The ALJ's Decision

In his August 3, 2022 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2021. (Tr. 1728.)

2.      The claimant has not engaged in substantial gainful activity since September 30, 2017, the alleged onset date. (Tr. 1729.)

3.      Through the date last insured, the claimant had the following severe impairments: gastrointestinal reflux/erosive esophagitis/gastritis/ duodenitis/diverticulosis, oropharyngeal dysphagia, benign brain schwannoma, vestibular disorder, degenerative disc disease of lumbar spine, weakness and foot drop in left lower extremity, chronic pain syndrome, asthma, migraines, adjustment disorder, depressive disorder, anxiety disorder, posttraumatic stress, neurodevelopmental disorder. (*Id.*)

---

[2] The ALJ's findings are summarized.

4.     Through the last date insured, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 1737.)

5.     Through the last date insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds. She can frequently balance, and occasionally stoop, kneel, crouch and crawl. She can never work at unprotected heights, with moving mechanical parts and never operate a motor vehicle. She can have occasional exposure to dust, odors, fumes, and other pulmonary irritants. She can perform simple, routine, and repetitive tasks, but not at a production rate pace (for of sitting for every 30 minutes of standing, followed by standing again. (Tr. 1734-35.)

6.     Through the last date insured, the claimant is unable to perform any past relevant work.  (Tr. 1749.)

7.     The claimant was born in 1983 and was 37 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 1750.)

8.     The claimant has at least a high school education.  (*Id*.)

9.     Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).  (*Id.*)

Based on the foregoing, the ALJ determined that Ms. Schuster had not been under a disability, as defined in the Social Security Act, from September 30, 2017 through September 30, 2021, the last date insured.  (Tr. 1751.)

## V.    Plaintiff's Arguments

Ms. Schuster's sole assignment of error is that the ALJ's finding that she can perform and sustain sedentary work is not supported by substantial evidence because the ALJ failed to properly analyze her reports of symptoms pursuant to SSR 16-3p.  (ECF Doc. 10 pp. 12-20.)

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

"Generally, . . . we review decisions of administrative agencies for harmless error." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  But even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Whether ALJ Erred in Evaluating Ms. Schuster's Subjective Symptoms**

In her sole assignment of error, Ms. Schuster contends that the ALJ erred in his evaluation of her symptoms under Social Security Ruling ("SSR") 16-3p.  (ECF Doc. 10, pp. 12-18.)  She argues the ALJ's decision is not supported by substantial evidence because it fails to clearly articulate how he evaluated her reported symptoms, despite "recit[ing] a great deal of evidence" that supports and is consistent with her allegations.  (*Id.* at pp. 13, 18.)  She argues more specifically that the ALJ did not take certain evidence into account, made incorrect statements, and was selective in his analysis of the evidence.  (*Id.* at pp. 14-15.)  The Commissioner responds that the ALJ properly considered the subjective symptoms and made a reasonable RFC assessment supported by substantial evidence.  (ECF Doc. 12, pp. 7-10.)

31

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247. There is no dispute that the first step is met in this case (Tr. 1729), so the discussion herein must focus on the ALJ's compliance with the second step.

The primary questions before this Court are whether the ALJ clearly articulated his evaluation of Ms. Schuster's symptoms, and whether that evaluation was supported by substantial evidence. Where—as here—the alleged symptoms include pain, an ALJ must evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994). These factors include daily activities, types and effectiveness of medications, treatment received

to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3). An ALJ's determination of credibility is reviewed under a harmless error standard. *Ullman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

To show the ALJ complied with his obligations under SSR 16-3p, the Commissioner points to the ALJ's "thorough, 26-page decision," which "considered Ms. Schuster's testimony and reported activities, the treatment notes, and the prior administrative medical findings and medical opinions" before concluding that Ms. Schuster could perform sedentary work as provided in the RFC. (ECD Doc. 12, p. 7.) As examples of the ALJ's consideration of the appropriate factors, the Commissioner highlights: (1) pain management records from 2020 and 2021 in which Ms. Schuster reported her narcotic pain medication was effective in reducing her pain and improving her functional ability without adverse effects; (2) evidence of occasions where Ms. Schuster declined to pursue treatment recommendations; (3) evidence indicating Ms. Schuster lived with a disabled husband and cared for seven children, including homeschooling them for a period of time; and (4) state agency medical consultant opinions that did not identify limitations greater than those adopted by the ALJ in the RFC. (*Id.* at pp. 7-8.)

In support of her argument that the ALJ failed to comply with his obligations under SSR 16-3p, Ms. Schuster makes the following specific criticisms:

- The ALJ did not adequately consider Ms. Schuster's testimony regarding the frequency of her headaches, and his decision did not support the finding that she was noncompliant with respect to her migraines (ECF Doc. 10, p. 14);

- The ALJ made a "clearly incorrect" statement that Ms. Schuster did not seek ongoing treatment for her schwannoma (*id.*);

- The ALJ failed to articulate how objective evidence such as her MRI findings detracted from the consistency of her allegations regarding chronic pain (*id.* at p. 15);

- The ALJ offered no citations to support a statement that the conclusions in certain examinations were inconsistent due to Ms. Schuster's lack of effort (*id.*); and

- The ALJ was "selective in his analysis" of evidence that she was "performing a 'wide array of activities,'" such as caring for and home schooling her seven children (*id.*).

The undersigned will address each of these criticisms in turn.

### 1.     ALJ Did Not Err in Evaluating Headaches and Related Treatment

Ms. Schuster argues that the ALJ did not adequately consider her testimony regarding the frequency of her headaches, which she described as "ongoing, severe headaches that were unpredictable," and did not support his claim that she was noncompliant with respect to her migraines.  (ECF Doc. 10, p. 14.)  In support, she notes only that the ALJ acknowledged her complaints of daily headaches in 2016, prior to the alleged onset date (*id.* (citing Tr. 1737)), and discussed records showing worsening headaches in 2017 and 2018 (*id.* (citing Tr. 1741)).  For the reasons set forth below, the undersigned finds the ALJ's analysis of Ms. Schuster's symptoms in connection with her headaches was supported by substantial evidence.

In the Step Three listings analysis, the ALJ discussed reported headaches as follows:

> As for headaches, the claimant received some treatment for migraine headaches. At the hearing, she testified she [*sic*] severe headaches where she would black out, and significant photophobia and phonophobia. . . . The claimant did not follow prescribed treatment and attend the pain rehabilitation program. Moreover, in 2021, the claimant indicated she had improvement in her headaches with the use of narcotic medication (31F).

(Tr. 1733.)  At Step Four, the ALJ acknowledged that Ms. Schuster "testified she was unable to work [because of] migraines" and "had migraines that occurred five to six times per month." (Tr. 1735.)  Nevertheless, the ALJ found the evidence did not support Ms. Schuster's assertion that she could not perform sedentary work due to her impairments.  (*Id.*)  In so finding, the ALJ acknowledged that Ms. Schuster took medication for migraines/headaches in 2016, prior to the alleged onset date (Tr. 1736-37), complained of worsening headaches in 2017 (Tr. 1739),

obtained a brain MRI showing a mass at her skull base and attended neurosurgical and oncology assessments for headaches in 2018, with radiosurgery being recommended for a cranial nerve schwannoma (Tr. 1739-40), underwent stereotactic radiosurgery in 2018, with resulting headaches that were treated with medications, after which Ms. Schuster did not seek further treatment for several months (Tr. 1741), reported in June 2018 that her left-sided headache had not improved with regular oxycodone (*id.*), received emergency room treatment for a headache in August 2018, when her neurosurgeon informed the treating physician that "schwannoma did not cause headaches" (Tr. 1742), was told by her neurosurgeon in November 2018 that her intracranial lesion was stable, with no further medical intervention needed (Tr. 1743), began treatment with pain management in 2020, reporting that her pain and headaches improved with medication (Tr. 1744), and reported a decrease in the frequency of her headaches in 2021 (*id.*). The ALJ had already observed at Step Three that Ms. Schuster did not follow prescribed treatment to attend a pain rehabilitation program for headaches and reported improvement in her headaches with the use of narcotic medications.  (Tr. 1733.)

Ms. Schuster does not argue that the ALJ's findings and observations regarding the above-described treatment records were incorrect, but instead that the ALJ did not "adequately take into account" her testimony regarding the frequency of her headaches.  (ECF Doc. 10, p. 14.)  As detailed above, a review of the ALJ's decision reveals that he did consider the available evidence regarding the frequency of Ms. Schuster's headaches.  The undersigned finds the ALJ's analysis of this factor was supported by substantial evidence.  This Court must accordingly "defer[] to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*, 581 F.3d at 406 (quoting *Key*, 109 F.3d at 273).

35

Ms. Schuster's additional argument that the ALJ did not "support his claim that Plaintiff was noncompliant with respect to her migraines" (ECF Doc. 10, p. 14) is also unavailing.  The ALJ correctly observed that Ms. Schuster did not follow prescribed treatment for headaches by attending a pain rehabilitation program.  (Tr. 1733.)  The medical records reflect that Ms. Schuster was referred to the Cleveland Clinic Foundation Center, Comprehensive Pain Recovery clinic in November 2020, with head pain being a chief complaint and concern.  (Tr. 2090-94.)  At that appointment, her provider strongly recommended a pain rehabilitation program and told her medical research does not support the long-term use of opioids for chronic pain; Ms. Schuster declined to join the program.  (Tr. 2094.)

The undersigned finds that the ALJ sufficiently articulated his analysis of Ms. Schuster's complaints of headaches, and made a determination supported by substantial evidence.

### 2.      ALJ Did Not Rely on "Clearly Incorrect" Findings Regarding Schwannoma

As to Ms. Schuster's assertion that the ALJ made a "clearly incorrect" statement that she did not seek ongoing treatment for schwannoma (ECF Doc. 10, p. 14), this argument appears to be based on a misreading of the ALJ's findings.  Although Ms. Schuster does not specifically identify the statement she is challenging, she appears to refer to the following findings:

> Shortly thereafter in November 2017, the claimant had worsening headaches and described her head pain was on left and right side that was achy pain that would come and go with moderate severity. She denied having any focal weakness or numbness. The[n] in December 2017, the claimant indicated that she had frequent falls and weakness. The claimant had an MRI of her brain that showed she had a hyper-vascular mass arising from the left carotid space at the skull base extending intracranially through the hypoglossal canal []. Subsequently, the claimant had testing, Vestibular Autorotation test (VAT) that showed she had peripheral vestibular pathology and recommended vestibular rehabilitation []. However, the claimant did not attend the treatment as advised. Furthermore, the claimant did not seek ongoing treatment for this condition. In addition, there was no evidence the claimant had blackouts or dizziness as she asserted.

(Tr. 1739 (citations omitted) (emphasis added).)  The finding clearly articulated by the ALJ was not that Ms. Schuster failed to seek ongoing treatment for schwannoma, but rather that she failed to seek ongoing treatment for her peripheral vestibular pathology.  (*Id.*)  This finding is consistent with the medical records, which do not demonstrate that Ms. Schuster participated in vestibular rehabilitation as recommended.  (*See* Tr. 858 (9/8/17 recommendation of vestibular rehabilitation), 1451 (6/30/18 recommendation of vestibular evaluation).)  The undersigned therefore concludes that this finding was supported by substantial evidence.

### 3.     ALJ Did Not Err in Evaluating Chronic Pain

Next, Ms. Schuster argues that the ALJ failed to articulate how objective evidence regarding her chronic back pain detracted from the consistency of her allegations regarding chronic pain.  (ECF Doc. 10, pp. 14-15.)  In support, she notes that the ALJ cited evidence that is supportive of Ms. Schuster's allegations of chronic pain, specifically her lumbar MRI findings from 2018 (Tr. 976) and 2019 (Tr. 1503-04, 1531-32).  (*Id.* (citing Tr. 1741, 1743).)  For the reasons set forth below, the undersigned finds the ALJ's analysis of Ms. Schuster's allegations of chronic pain was supported by substantial evidence.

At Step Four, the ALJ acknowledged that Ms. Schuster "testified she . . . had back pain and [was] unable to feel her left leg that caused her to fall."  (Tr. 1735.)  Nevertheless, the ALJ found the evidence did not support Ms. Schuster's assertion that she could not perform sedentary work due to her impairments.  (*Id.*)  In so finding, the ALJ first described certain findings that preceded the alleged onset date "to provide a complete history of [Ms. Schuster]'s medical treatment," including: a 2012 MRI showing disc degeneration and "minimal bulging" (Tr. 1736); a 2014 evaluation for low back pain, years before the alleged onset date, with noted "decreased effort throughout the assessment" and indications of "doctor shopping" (Tr. 1736); treatment for

low back pain in 2015, with Cymbalta and a referral to physical therapy, and a normal nerve conduction study of the lower extremities (*id.*); some physical therapy sessions for back pain in 2015 and 2016, but with no further physical therapy undertaken thereafter, even when recommended by a provider (*id.*); a 2016 evaluation for low back pain where the provider noted "suspected embellishment" and an examination that was "histrionic and exaggerated," with a recommendation to attend physical therapy (Tr. 1737); and another physical examination with marked histrionics and suggestions that Ms. Schuster was embellishing symptoms for purposes of a disability determination (*id.*).

The ALJ next described various treatment records and findings subsequent to the alleged onset date, including: treatment in November 2017 for low back and left leg pain, with noted abnormal physical examination findings, resulting in prescriptions for compression stockings and Cymbalta (Tr. 1738-39); a 2017 MRI noting a small central protrusion at L4-5 and a mild disc bulge at L3-4, resulting in a referral to pain management, which Ms. Schuster did not begin to attend until 2020 (Tr. 1739); a 2018 MRI revealing diffuse disc bulging with small disc protrusions resulting in mild to moderate stenosis at L3-4 and L4-5 (Tr. 1741); a 2019 MRI revealing small central disc protrusions indenting the thecal sac at L3-4 and L4-5, with no significant interval change from the prior study (Tr. 1743); a 2020 primary care office note where Ms. Schuster requested a quad cane and walked with a limp, but was noted to "decline[] to follow treatment advice and attend physical therapy" (*id.*); a 2020 pain management assessment which noted abnormal findings on physical examination and resulted in a prescription for narcotic medication (Tr. 1743-44); descriptions of office notes for pain management treatment visits in 2020, where Ms. Schuster sometimes reported increased pain and struggling to care for her children, but also reported that her pain improved with medication and that she was

continuing to care for her seven children (Tr. 1744); and descriptions of office notes for pain management treatment visits in 2021, where Ms. Schuster sometimes reported her pain was stable and sometimes reported continuing to care for her children (Tr. 1745).

Ms. Schuster's conclusory argument that the ALJ "fail[ed] to articulate" how the MRI findings "detracts from the consistency of Plaintiff's allegations regarding chronic pain" (ECF Doc. 10, p. 15) is not well taken.  As outlined above, the ALJ provided a detailed and lengthy discussion of Mr. Schuster's treatment history with respect to her alleged chronic pain.  The ALJ acknowledged Ms. Schuster's complaints of pain, abnormal MRI and physical examination findings, treatment modalities, and reports of continued pain despite those treatments.  However, he also noted her reported history of symptom magnification, limited MRI findings without significant interval change, failure to participate in recommended treatments (e.g., physical therapy), delays in seeking treatment (e.g., pain management), reports of improvement with treatment, and reports of activities of daily living such as childcare.

The undersigned finds that the ALJ sufficiently articulated his analysis of Ms. Schuster's complaints of chronic pain, and made a determination supported by substantial evidence.

### 4.    ALJ Did Not Err in Referring to Reported Lack of Effort of Examination

Ms. Schuster also contends that the ALJ erred under SSR 16-3p when he observed—without a supporting citation to the record—that: "Thereafter, the record showed the claimant received treatment from multiple medical providers, and the conclusions of the examinations were inconsistent, mostly due to the claimant'[s] lack of effort."  (Tr. 1737; *see* ECF Doc. 10, p. 15.)  However, Ms. Schuster's argument appears limited to an assertion that the ALJ failed to provide a citation to support this finding.  She does not identify evidence of record suggesting

that this finding mischaracterizes the evidence of record, and does not provide legal support for a finding that the failure to cite the referenced evidence is a harmful error supporting remand.

In considering this argument, the undersigned makes two observations.  First, the location of the challenged statement within the ALJ's decision—between discussion of an April 2016 medical record and a January 2017 medical record—suggests that it references a time before the alleged onset date, which the ALJ stated he discussed "only to provide a complete history of the claimant's medical treatment."  (Tr. 1735; *see* Tr. 1737.)  Second, while the challenged language does not specifically identify the medical records being referenced, a review of the ALJ decision does reveal discussion of specific instances where Ms. Schuster was observed to make inadequate effort on examination or appeared to embellish her symptoms.  (*See, e.g.,* Tr. 1736 (citing Tr. 591), 1737 (citing Tr. 600, 604).)  In light of these observations, the undersigned finds Ms. Schuster has failed to prove that the lack of a record citation in support of the challenged language deprives the ALJ's analysis of a clear explanation or substantial evidence in support.

### 5.    ALJ Did Not Err in Considering Plaintiff's Activities of Daily Living

Finally, Ms. Schuster argues that the ALJ erred in observing that she performed "a 'wide array of activities[,]' such as caring for her seven children, and homeschooling her children" in support of his subjective complaint analysis because he was "selective in his analysis" and "failed to properly discuss [her] testimony that 5 of her children were typically in school during the day, and her mother, who lives a mile away, watches her younger children (Tr. 54) and her testimony that her mother, husband[,] and friends help her with her children (Tr. 1792)."  (ECF Doc. 10, p. 15.)  For the reasons set forth below, the undersigned finds the ALJ's analysis of Ms. Schuster's activities of daily living was supported by substantial evidence.

As an initial matter, it is undisputed that an individual's ability to participate in activities of daily living is relevant to an ALJ's assessment of her subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3)(i); *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 417 (6th Cir. 2020) ("We have long held that '[a]s a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain.'" (quoting *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (per curiam) (citation omitted)).).

Here, the ALJ discussed the following evidence regarding Plaintiff's activities of daily living during the alleged disability period in connection with his finding that "the evidence does not support the claimant's assertions that she could not perform sedentary work" (Tr. 1735):

- November 2017: Ms. Schuster reported that she resided with her daughter and two sons, and had adopted foster children recently (Tr. 1745);

- November 2017: She reported needing to take breaks with cooking, cleaning, and household chores due to difficulty with prolonged walking and sitting, but shopped, participated in activities with her children and school, and enjoyed watching her children play sports (*id.*);

- 2017: She attended a few sessions of psychotherapy, where she was advised to seek time to care for herself, since she was a caregiver for her children (Tr. 1746);

- 2017: She reported at psychotherapy that she was managing recent issues with her children and the school, including special education needs (*id.*);

- August 2018: At her consultative psychological assessment, she acknowledged performing activities that included raising six children between four months and nine years old (five adopted), dressed when leaving the house, did some household chores, accessed social media, and could drive and briefly engage in shopping activities (*id.*);

- April 2020: She reported struggling to care for her seven children due to increased pain (Tr. 1744);

- June, July, and October 2020: She reported at pain management that she was continuing to care for her seven children (*id.*);

- September 2020: She was homeschooling her children (*id.*);

- April 2021: She delayed filling her narcotic medication "since she was taking care of her child that was in the hospital for two weeks" (Tr. 1745); and

- October 2021: She cared for two of her children, who tested positive for Covid (*id.*).

Challenging the ALJ's discussion of her activities of daily living as "selective," Ms. Schuster points to the final two examples above and notes that "it is not clear what activities Plaintiff actually did" when her child was in the hospital for two weeks, and that "it is not clear what care [was] involved" when Ms. Schuster was caring for two children who tested positive for Covid.  (ECF Doc. 10, p. 15.)  A review of the relevant medical records bears out Ms. Schuster's argument that it is unclear from the record what specific caregiving activities she undertook on those two occasions.  Her pain management record from April 2021 stated only: "On an unrelated note, she did not fill her prescription until 4/20/21.  Her son was hospitalized for 2 weeks."  (Tr. 1947.)  Her pain management record from October 2021 reported only that she was "caring for two of her seven children who [we]re COVID positive."  (Tr. 1963.)

Although the ALJ did not outline Ms. Schuster's specific childcare activities on those two occasions—which would presumably have been difficult because the specific activities also were not delineated in the records themselves—this Circuit has long held that an ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  The question is not whether the ALJ discussed every piece of available information regarding Ms. Schuster's childcare duties and other activities of daily living, but whether he clearly explained his consideration of that information and made a decision supported by substantial evidence.

Ms. Schuster argues that substantial evidence is lacking because the ALJ referenced her childcare responsibilities but did not also discuss her testimony that five of her seven children were typically at school during the day, or that she received help from her mother, husband, and

42

friends.  (ECF Doc. 10, p. 15 (citing Tr. 54, 1792).)  Ultimately, she asserts "the ALJ's decision essentially boils down [to] his belief that because Plaintiff 'cares' for her children, she can sustain full time work activity, day in and day out."  (*Id.* at p. 15.)

If it were an accurate characterization of the ALJ's decision to say that he found Ms. Schuster capable of sedentary work only because she told her providers she was caring for seven children, the situation would be concerning for a lack of substantial evidence.  But that is not an accurate characterization here.  The ALJ found it relevant to the subjective symptom analysis that Ms. Schuster and her disabled husband became adoptive or foster parents to several young children near the alleged onset date, bringing the total number of children under age twelve in their household to seven, and continued to care for seven children throughout the alleged disability period.  Indeed, those were appropriate considerations.  *See* 20 C.F.R. § 404.1529(c)(3)(i); *O'Brien*, 819 F. App'x at 417; *Blacha*, 927 F.2d at 231; *see also Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, 2019 WL 6841771, at \*3 (N.D. Ohio Dec. 16, 2019) ("[W]hile merely citing to a claimant's daily activities cannot conclusively establish an ability to engage in full-time work, it is also true that a claimant's capacity to perform tasks in daily living is a legitimate factor to be considered in assessing the claimant's functional capacity.").

But the ALJ did not rest his symptom analysis on Ms. Schuster's childcare activities alone.  He also considered Ms. Schuster treatments, including those that were delayed or not undertaken, the types and effectiveness of her medications, her other activities of daily living, and the medical opinion evidence.  (Tr. 1735-49.)  The record reflects that Ms. Schuster consistently reported caring for her seven children in visits to pain management.  (*See e.g.*, Tr. 1903, 1907, 1911, 1923, 2239.)  She reported doing limited chores, cooking from a seated position, watching TV, and doing some driving and shopping.  (Tr. 253, 263-64.)  She also

declined to pursue several treatments, including: physical therapy for her pain (Tr. 1743 (citing

Tr. 1981)), vestibular evaluation for her dizziness (Tr. 1743 (citing Tr. 1743); *see also* Tr. 1451

(recommending vestibular rehabilitation for dizziness), and chronic pain rehabilitation (Tr. 1747

(citing Tr. 2094)).  *See also Blaim v. Comm'r of Soc. Sec.*, 595 F. App'x 496, 499 (6th Cir. 2014)

(finding plaintiff's "persistent disregard of his doctors' advice . . . suggested that his conditions

were not as severe as he made them out to be").  She underwent radiosurgery for her benign

schwannoma, which was successful.  (Tr. 948, 1039, 1010-49.)  The record demonstrates that

multiple diagnostic efforts related to left side weakness symptoms did not reveal a cause for her

symptoms (*see, e.g.*, Tr. 537-39, 2213), that Ms. Schuster sometimes denied weakness (*see, e.g.*,

Tr. 2221) or was observed to have a normal gait (*see, e.g.*, Tr. 548, 958, 1156) and that her pain

treatment regime was primarily a prescription for Percocet (*see generally* Tr. 1887-1975; *see

also* 20 C.F.R. § 404.1529(c)(3)(iv) (ALJ should consider "[t]he type, dosage, effectiveness, and

side effects of any medication" taken to alleviate symptoms).)  The ALJ considered the above

information alongside the evidence that Ms. Schuster cared for her seven children.

In light of the evidence discussed and considered by the ALJ in his symptom analysis, the

undersigned finds the ALJ's failure to specifically discuss reported assistance with childcare

does not deprive the analysis of the support of substantial evidence.  "'The substantial-evidence

standard . . . presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800

F.2d at 545).  While Ms. Schuster argues the ALJ should have addressed her testimony that five

of her children were in school during the day (ECF Doc. 10, p. 15), that factual scenario still puts

two small children in Ms. Schuster's care all day and seven in her care once school lets out.

Similarly, her reported ability to call her mother to help on "bad" days (Tr. 54) could suggest a

baseline situation where Ms. Schuster is the primary caregiver.  Certainly, her testimony does not place her husband in the primary caregiving role, with his assistance reportedly limited to disciplinary measures he was able to undertake while seated on the couch.  (Tr. 54.)

Again, it is not this Court's role to consider the evidence *de novo*.  While Ms. Schuster disagrees with the ALJ's evaluation of her subjective allegations and contends that her symptoms were completely disabling, the ALJ's analysis was properly based on the entirety of the record, clearly articulated specific reasons for the weight given to the subjective allegations, and articulated reasons which were consistent with and supported by the evidence.  *See Ullman*, 693 F.3d at 714 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess. . . .")  For the reasons stated above, based on the decision and the record before this Court, the undersigned finds the ALJ properly considered and weighed the evidence and did not err in his evaluation of Ms. Schuster's subjective allegations.

## VII.   Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**

January 30, 2024                    */s/Amanda M. Knapp*
                                    AMANDA M. KNAPP
                                    United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).